# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF UTAH

| | |
|---|---|
| **SHERMAN OLMSTEAD,** <br><br> **Plaintiff,** <br><br> vs. <br><br> **COTTONWOOD CREEK AGENCY, LLC, and LANNY DERBY,** <br><br> **Defendants.** | **MEMORANDUM DECISION AND ORDER** <br><br> Case No. 2:24-CV-507-DAK-JCB <br><br> Judge Dale A. Kimball <br><br> Magistrate Judge Jared C. Bennett |

This matter is before the court on Defendants Cottonwood Creek Agency, LLC, and Lanny Derby's Motion to Dismiss [ECF No. 12] and Motion to Compel Arbitration and to Stay [ECF No. 17]. On November 14, 2024, the court held a hearing on the Motion to Dismiss. At the hearing, Plaintiff Sherman Olmstead was represented by Zachary C. Meyers, and Defendants were represented by William S. Helfand and Megan Marie Marchick. The court took the motion under advisement.   On January 2, 2025, Defendants filed the Motion to Compel Arbitration and to Stay. That motion is now fully briefed. The court will rule on that motion based on the parties' written submissions. After considering the parties' arguments and the law and facts relevant to the pending motions, the court issues the following Memorandum Decision & Order on the pending motions.

## BACKGROUND

Plaintiff Sherman Olmstead worked at Cottonwood Creek Agency from April 14, 2020, to February 13, 2022, as a licensed sales producer. Cottonwood Creek provided Olmstead with an offer letter on April 14, 2020, stating that "[i]t should be understood this offer does not constitute a

1

contract of employment for any particular period or a guarantee of continued employment. Our relationship is one of voluntary employment 'at will.'" The letter then explained that "at will" meant that either party could terminate the employment "at any time for any reason."

The April 14, 2020 Offer Letter also stated that Olmstead's "base salary will be $17/hr paid two times a month on the 15th and the last day of each month." The Offer Letter further explained that "[c]ommissions will be paid once per month to coincide with the Agency being paid commissions from Allstate for bound items on the 15th working day of each month in the month following the month items were bound."

Cottonwood Creek sent Olmstead an Amended Offer Letter on September 25, 2020, which Cottonwood Creek claims supersedes the April 20, 2020 Offer Letter. This Amended Offer Letter states that Olmstead will be paid only commissions and that "I [Olmstead] have carefully reviewed this offer of employment and agree that it sets forth the entire understanding between Cottonwood Creek Agency and me." It further states that "this offer supersedes all prior offers, both verbal and written."   Olmstead referred to this September Amended Offer Letter in his Complaint, but only attached the April Offer Letter as an exhibit to his Complaint.

The parties disagree as to which of these Offer Letters controlled the terms of Olmstead's compensation. Olmstead contends that the April Offer Letter controls, and Cottonwood Creek argues that the September Offer Letter controls. Olmstead claims that the September Offer Letter is invalid because it was either fraudulently induced, entered under duress, unenforceable because it was subsequently modified, or an illegal contract in violation of public policy because it does not provide a minimum wage. Cottonwood Creek argues that Olmstead accepted the terms of the agreement and continued working for it.

Olmstead alleges that beginning in June 2021, Cottonwood Creek and Derby began

2

shorting his pay in violation of the parties' agreement. Even assuming that the commission-only agreement was enforceable, Olmstead alleges that Cottonwood Creek and Derby failed to pay him the amount owed to him under the September Offer Letter. Olmstead alleges that Cottonwood Creek and Derby failed to pay the amount of wages owed to him from June 1, 2021, to February 14, 2022.

On February 11, 2022, Olmstead, through his attorney, sent a letter to Cottonwood Creek and Derby requesting records that would permit him to calculate his unpaid wages and signaling to them that Olmstead intended to file a wage claim if they did not pay his full wages. Two days later, Olmstead claims that he was fired in retaliation for threatening to bring a wage claim against them. However, the parties disagree as to whether Olmstead resigned or was fired.

Olmstead filed for unemployment compensation benefits, which was denied.   He then challenged the denial of his claim for unemployment compensation benefits, and an Administrative Law Judge ("ALJ") with the Utah Department of Workforce Services ("DWS') determined that Olmstead voluntarily resigned from Cottonwood Creek without good cause to do so. Olmstead appealed that decision to the DWS appellate board, and the board upheld the ALJ's decision. Utah state law would allow Olmstead to appeal that decision to the Utah Court of Appeals, but Olmstead did not appeal to the Utah Court of Appeals. Cottonwood Creek asserts that the court should take judicial notice of the findings by the ALJ at DWS.

Olmstead filed this case against Cottonwood Creek and Derby, alleging causes of action for (1) breach of contract and breach of the implied covenant of good faith and fair dealing, (2) violation of the Utah Minimum Wage Act and Fair Labor Standards Act, (3) violation of the Utah Payment of Wages Act, and (4) retaliation and wrongful termination in violation of the Utah Payment of Wages Act.

## DISCUSSION

### **Cottonwood Creek's Partial Motion to Dismiss**

Cottonwood Creek seeks to dismiss all of Olmstead's claims except his claims under the Fair Labor Standards Act ("FLSA") and his claims under the Utah Payment of Wages Act ("UPWA") for alleged unpaid wages after June 20, 2021.

### I. Breach of Contract

Cottonwood Creek argues that the court should dismiss Olmstead's breach of contract claim because Olmstead has not plausibly stated a prima facie breach of contract claim, where he expressly disavowed the creation of a contract between the parties when he accepted the Offer Letters. Cottonwood Creek claims that the plain language of the Offer Letters expressly disproves Olmstead's allegation of an employment contract.

The existence of a valid contract is the first element of a prima facie case of breach of contract. *Am. W. Bank Members, L.C. v. State*, 2014 UT 49, ¶ 15, 342 P.3d 224, 230. The Offer Letters expressly state that they do not constitute a contract of employment. This express agreement is a clear indication that no employment contract was formed. *Utah Valley Univ. v. Stewart*, 2012 UT 69, ¶ 11, 296 P.3d 779, 782. "An agreement cannot be enforced if its terms . . . demonstrate that there was no intent to contract." *Butler v. EME, Inc.*, No. 2:17-cv-140-ECF, 2018 U.S. Dist. LEXIS 84303, at *33 (D. Utah 2018). Moreover, in Utah, absent a specified term of duration of employment, the legal presumption is that the employment is at will. *See Kirk v. Rockwell Collins, Inc.*, 2015 U.S. Dist. LEXIS 20851, at *12 (D. Utah Feb. 4, 2015). "[A]n employee hired for an indefinite period is presumed to be an employee at-will who can be terminated for any reason whatsoever so long as the termination does not violate a state or federal statute." *Johnson v. Morton Thiokol, Inc.*, 818 P.2d 997, 1000 (Utah 1991). The burden to

demonstrate abrogation of the presumption of employment at-will rests with Plaintiff. *Tomlinson v. NCR Corp.*, 345 P.3d 523, 527 (Utah 2014). "[A]n express at-will agreement is enforceable under Utah law as written." *Giusti v. Sterling Wentworth Corp.*, 201 P.3d 966, 976 (Utah 2009).

Olmstead is not claiming that he has an employment contract for a specified term of employment that would have changed his at-will status. Rather, he is claiming that the April 14, 2020 Offer Letter constitutes an enforceable at-will employment contract that obligates Cottonwood Creek to pay the agreed upon wages and commissions. Many Utah cases refer to "at-will employment contracts." Cottonwood Creek itself quoted a case stating that "an express at-will agreement is enforceable under Utah law as written." *Id.* The Complaint alleges that there was an offer of at-will employment embodied in the April 14, 2020 Offer Letter, which was accepted by Olmstead, and it formed an enforceable contract. The letter states that the parties understand that the offer "does not constitute a contract of employment for any particular period or a guarantee of continued employment. Our relationship is one of voluntary employment 'at will.'"

But even though the Offer Letter clearly forms an at-will employment term, Olmstead is arguing that the Offer Letter entitled him to the payment of wages and commissions pursuant to the parties' contract, as written. Therefore, Olmstead has stated a claim for breach of the payment provisions. Although the parties dispute the operative Offer Letter, the court finds that under either Offer Letter, there is no basis for dismissing his claim for breach of the payment terms at this stage of the litigation.

Cottonwood Creek further argues that even if Olmstead claims that his "contract" entitled him to a specific rate of pay, Olmstead's state law claim for breach of contract is preempted by his claim under the Fair Labor Standards Act ("FLSA"), which Cottonwood Creek is not moving to dismiss. Cottonwood Creek contends that the FLSA preempts Olmstead's breach of contract claim

because it is redundant of his FLSA claim.

"[W]here a state common law claim is based upon the same facts as a FLSA cause of action, the duplicative state-law claim is preempted by the FLSA and must be dismissed." *Gutierrez v. Summit Mt. Holding Grp.*, No. 1:17-cv-49, 2018, U.S. Dist. LEXIS 192532, at *16 (D. Utah 2018). But any "preemption inquiry must start with the basic assumption that Congress did not intend to displace state law." *Anderson v. Sara Lee Corp.*, 508 F.3d 181, 192 (4th Cir. 2007). The "presumption is stronger still against preemption of state remedies, like tort recoveries, when no federal remedy exists." *Id.* at 191. The FLSA generally requires employers to pay employees a minimum wage and requires payment of "overtime" wages. Because of the FLSA's "unusually elaborate enforcement scheme," state law claims are "preempted by the FLSA where those claims have merely duplicated FLSA claims." *Id.* at 193-94. For example, in *Anderson*, a class of employees brought claims based on contract, negligence, and fraud that were all based on rights created by the FLSA. *Id.* at 193.

Cottonwood Creek argues that both claims allege that Olmstead is owed wages and both claims seek monetary relief for Cottonwood Creek's failure to pay those wages. Compl. ¶¶ 23, 28. Under this "conflict preemption," Cottonwood Creek must show a conflict between the FLSA claim and Olmstead's breach of contract claim. In this case, there is no federal remedy for an employer's failure to pay agreed upon wages and commissions above the minimum wage. Therefore, there is a presumption against preemption. Olmstead's contract claim is not dependent on the FLSA claim. His claim is not alleging a minimum wage violation, an overtime violation, or that he was mischaracterized as an independent contractor. He is alleging a violation of the April 14, 2020 Offer Letter, which provided for a certain amount of pay for work performed. It is a straightforward breach of contract claim. It is not necessary to find a violation of the FLSA to find

a breach of contract in this case. In fact, the contract claim has nothing to do with the FLSA. Olmstead's allegations at the beginning of each cause of action that all the prior paragraphs in the complaint are realleged and incorporated into the cause of action does not demonstrate that the claims rely on each other. It is a mere formality. It does not substantively prove that the claims are interconnected in a way that would support preemption. Therefore, the court finds that Olmstead's breach of contract claim is not preempted by the FLSA. Accordingly, the court denies Defendants' motion to dismiss Olmstead's breach of contract claim as a matter of law.

## II.     Breach of Covenant of Good Faith and Fair Dealing

Defendants argue that because Olmstead did not have a contract with Cottonwood Creek, he cannot state a claim for a breach of the covenant of good faith and fair dealing. "A claim for breach of the covenant of good faith and fair dealing is a derivative of the breach of contract claim. Because [Plaintiff] did not allege the existence of facts required to plead a breach of contract, [he] has also failed to plead a breach of the covenant of good faith and fair dealing." *Am. W. Bank Members*, 2014 UT 49, P19, 342 P.3d at 231. However, the court has concluded that Olmstead has pled a plausible breach of contract claim. Defendants, therefore, have not put forth any other valid basis for dismissing the claim. Accordingly, the court denies Defendants' motion to dismiss Olmstead's claim for breach of the covenant of good faith and fair dealing.

## III.     UMWA Claim

The parties agree that Plaintiff's UMWA claim should be dismissed because it is barred by the statute of limitations. Utah Code Ann. § 34-40-205.

## IV.     UPWA Claim

The parties agree that any claim under the Utah Payment of Wages Act for wages prior to June 20, 2021, is barred by the applicable statute of limitations. Therefore, Olmstead's claim under

the UPWA is only for allegedly due wages and bonuses from June 20, 2021, to February 22, 2022.

In addition, Cottonwood Creek argues that the court should dismiss Olmstead's UPWA claim because the September 25, 2020 Offer Letter provides for a commission only form of payment and, therefore, Utah Code Ann. § 34-28-5 does not apply to commissions. Utah Code Ann. § 34-28-1 states that it does not apply "where an agreement exists between employer and employee providing for different terms of payment." *See Action Elec. Co. v. Industrial Comm'n*, 636 P.2d 474, 475 (Utah 1981). Where, as here, the employee "had an individual employment agreement," Chapter 28 does not apply. *Id.* Utah Code Ann. § 34-28-5(4) states that "for a sales agent employed in whole or in part on a commission basis who has custody of accounts, money, or goods of the sales agent's principal, this section does not apply to the commission-based portion of the sales agent's earnings of the net amount due to the agent is determined only after an audit or verification of sales, accounts, funds, or stocks."

Olmstead contends that his claim is not based on commissions that are "determined only after an audit or verification." The UPWA provision Cottonwood Creek relies on refers to sales agents who have "custody of accounts, money, or goods of the sales' agent's principal." Olmstead asserts that he did not have custody of accounts, money or goods belonging to Cottonwood Creek. The Offer Letters did not say anything about audits or verifications before payment of commissions. Therefore, the net amount due to Olmstead need not be determined after an audit or verification of sales. If Cottonwood Creek wishes to assert an exception to the general rule, it has the burden to demonstrate facts that would suggest that the exception applies. The Complaint does not contain any such facts, and Cottonwood Creek would need to put forth such facts at a later stage in the litigation, not in connection with a motion to dismiss. For purposes of the motion to dismiss, the court cannot determine whether the relied upon UMWA provision

applies.

Olmstead also argues that the parties' agreement does not alter UPWA's statutory scheme. The UPWA "requires employers to make timely and regular payment of wages to their employees, to give notices of their rate and date of payment, to settle wages due promptly upon voluntary or involuntary severance, . . . and to keep payroll records." *Action Elec. Co. v. Indus. Comm'n of Utah*, 636 P.2d 474, 475 (Utah 1981) (citing Utah Code Ann. §§ 34-28-3 to -5, -10). "The wage payment legislation is apparently aimed at helping those whose employment contracts are silent on its subject matter. It is expressly inapplicable to 'employment where an agreement exists between employer and employee providing for different terms of payment." *Id.* (quoting Utah Code Ann. § 34-28-1). Olmstead argues that the employment agreement does not provide for different terms of payment. The April Offer Letter does not contradict or supplant the UPWA. The UPWA states that an "employer shall pay the wages earned by an employee at regular intervals, but in periods no longer than semimonthly on days to be designated in advance by the employer as the regular payday." Utah Code Ann. § 34-28-3(1)(a). The April Offer Letter's terms are consistent with the UPWA. Even if the September Offer Letter is the enforceable contract, this agreement does not supplant the default rules in the UPWA because, like the April Offer Letter, it provides that paydays will occur on the 15th and last day of the month

Moreover, nothing in the April Offer Letter or September Offer Letter addresses how payment will be made after separation, which is generally governed by the UPWA. Unless a written contract provides otherwise, an employer must comply with the requirements of the UPWA for payment upon separation. In this case, there is nothing in the employment contract specifying anything different for payment after separation. Therefore, the statute would govern if Olmstead was entitled to payment upon separation. However, Cottonwood Creek claims that the

9

UPWA separation provisions do not apply because Olmstead resigned. The parties dispute whether Olmstead voluntarily resigned or was constructively discharged. Whether Olmstead is entitled to payment upon separation under the UPWA would only be a portion of Olmstead's UPWA claim. Therefore, because there are factual questions as to applicability of other UPWA provision, there is no basis for dismissing the entire claim. Accordingly, the court denies Defendants' motion to dismiss Olmstead's UPWA claim.

  V.  **Retaliation Claim/Wrongful Termination Claim**

Defendants argue that the court should dismiss Olmstead's retaliation/wrongful termination claim because he was not terminated, he voluntarily resigned. Defendants contend that the court can take judicial notice of the DWS ALJ's factual determination that Olmstead voluntarily resigned with no good cause because the ALJ's factual findings cannot reasonably be disputed. Under Federal Rule of Evidence 201(b) a court can take judicial notice if the dispute cannot be subject to reasonable dispute because it "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." *Id.*

Defendants further assert that Olmstead should be collaterally estopped from seeking a different finding on that issue in this court. The prior issue decided—whether Olmstead was fired or resigned—is critical to Olmstead's retaliation claim. The adverse action supporting Olmstead's retaliation claim is his allegation that Defendants fired him. In connection with an unemployment insurance claim, the DWS ALJ determined that Olmstead voluntarily resigned. The ALJ took testimony from Olmstead and Cottonwood Creek. Olmstead appealed the ALJ's decision, and it was affirmed by the Workforce Appeals Board ("WAB"). That decision became final when Olmstead did not appeal the decision to the Utah Court of Appeals. Utah Code Ann. § 63G-4-401, Utah R. App. P. 14. Defendants contend that Olmstead cannot seek a different result in this case

because he was a party to the prior adjudication, he had a full and fair opportunity to litigate the issue, and he chose not to continue appealing the ruling.

In *Sauers v. Salt Lake County*, 722 F. Supp. 676 (D. Utah May 12, 1989), the court noted that "when a state agency 'acting in a judicial capacity . . . resolves disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate,' . . . federal courts must give the agency's fact-finding the same preclusive effect to which it would be entitled to in the State's courts." *Id.* at 680 (quoting *University of Tennessee v. Elliott*, 478 U.S. 788, 799 (1986)). In *Larsen v. Davis Cnty.*, 1:13-cv-68-CW, 2016 WL 3199474, *5 (D. Utah June 8, 2016), the court also found that an issue decided by WAB had preclusive effect.

Olmstead argues that the determination of the DWS ALJ does not preclude his retaliation/wrongful termination claim because there is no authority for collaterally estopping Olmstead from asserting claims in this action based on the administrative proceeding regarding unemployment benefits. But there is no dispute that the ALJ took testimony and was acting in a judicial capacity. The ALJ also specifically determined that Olmstead voluntarily quit without good cause. Olmstead contends that for issue preclusion to apply, however, Defendants must show that "the ultimate fact or issue was actually litigated" and the ultimate determinations are different in the two proceedings. Olmstead states that Defendants cannot do so because the ALJ was determining whether he was entitled to unemployment benefits, the ALJ was not determining whether Olmstead was constructively discharged. Therefore, Olmstead asserts that the ultimate issues in his retaliation and wrongful termination in violation of public policy claims were not "actually litigated" before the ALJ.

Olmstead relies on *Stone v. Dep't of Aviation*, 290 F. App'x 117 (10th Cir. 2008), but in that case, the state agency did not act in a judicial capacity. Olmstead also relies on *Cohon v. New*

11

*Mexico Dep't of Health*, 646 F.3d 717 (10th Cir. 2011), where the Tenth Circuit stated that where "the record reveals nothing on the issue of discrimination, let alone how it was 'actually litigated' or 'necessarily determined' in the administrative hearing," there is no determination that can be given preclusive effect. *Id.* at 724. Olmstead argues that DWS did not resolve the ultimate fact or issue because the ALJ order did not address or consider whether Olmstead was constructively discharged in retaliation for protected activity under the UPWA. The ALJ proceedings dealt with whether Olmstead voluntarily quit when he failed to report to work at one of Cottonwood Creek's offices after Defendants had been allowing Olmstead to work from home because of his sensitivity to light and sound. But Olmstead's citation to *Cohon* is inapplicable here because the record in that case did not reveal how the issue was determined and there are extensive findings of fact by the ALJ in this case.

The issues before the ALJ were not related to Olmstead's pay disputes, but only because Olmstead did not raise the issue in support of why he did not report to work. The issue of whether Olmstead had good cause for failing to report to work related to Defendants telling Olmstead that he should report to their second office by himself so that his disability could be accommodated in that setting, and they could meet the requirements of their franchise agreement by having both offices open. There was no dispute that Olmstead did not report to work at that office or that it was related to dispute about pay. Olmstead gave testimony about his disability, albeit without any proof from a medical provider about specific accommodations he would need to work full time in an office setting, and the ALJ found that Olmstead did not establish a hardship to working in an office by himself where his employer was willing to make the accommodations necessary. The ALJ concluded that Olmstead did not establish good cause for not reporting to work because, prior to quitting, Olmstead did not explore the accommodations that would be provided in the office. In

finding that Olmstead did not act reasonably in not showing up to work in the office, the ALJ found that Olmstead did not provide any compelling testimony which would motivate a reasonable person in his same circumstances to quit his job without having secured other employment.

In this case, Olmstead's allegations are that Defendants made his working conditions so intolerable by paying him only commissions that he could not continue his employment. He does not raise any claim connected with disabilities needing accommodation or the need to return to the office. But at the proceedings before the ALJ, Olmstead had the opportunity to provide any good cause for not continuing his employment with Defendants and he relied only on his disability. He did not mention anything about the payment of wages, retaliation for seeking payment, or the intolerable conditions of being paid only commissions. Olmstead had the opportunity to present any reasonable explanation for not reporting to work and he did not mention the issues he now raises here. The court concludes that the ultimate issue of whether Olmstead voluntarily resigned or was constructively discharged is present in both cases and was decided before the ALJ. Accordingly, Olmstead cannot demonstrate an adverse action for his retaliation claim or that a termination happened through constructive discharge for his wrongful termination claim. The court takes judicial notice of the ALJ's and WAB's determination that Olmstead had no good cause for quitting and dismisses Olmstead's retaliation and wrongful termination claims.

## VI.   Claims Against Lanny Derby

Defendants further argue that Olmstead's causes of action seeking to impute personal liability against Lanny Derby should be dismissed because he is shielded from personal liability as an LLC member. Cottonwood Creek is an LLC, and under Utah's Limited Liability Company Act, Utah Code Ann. § 48-2b-101, LLC members are insulated from personal liability just as "shareholders are generally insulated from personal liability for the liabilities of a corporation." *Ditty v.*

13

*CheckRite*, 973 F. Supp. 1320, 1135 (D. Utah 1997). "[N]either the members, the managers, nor the employees of a limited liability company are personally liable under a judgment, for a debt, obligation, or liability of the limited liability Company." Utah Code Ann. § 48-2b-109(1).

Olmstead agrees that Derby cannot be held vicariously liable for the acts of his company but alleges that he has facts to prove that Derby directly participated in tortious conduct. Olmstead argues that corporate officers are not shielded from liability for their individual wrongful acts. "While directors and officers of a corporation are not rendered personally liable for its torts merely because of their official positions, they may become liable if they directly order, authorize, or participate in the tortious conduct." *d'Elia v. Rice Dev, Inc.*, 2006 UT App 416, ¶ 46, 147 P.3d 515, 526.

Here, Olmstead claims that he has alleged facts sufficient to prove that Derby directly participated in the tortious conduct that caused his damages. However, Olmstead's causes of action are not torts. He has a breach of contract claim and statutory claims that do not sound in tort. The court has dismissed Olmstead's fourth cause of action for retaliation and wrongful termination. Moreover, while Olmstead's Complaint uses the word fraudulently, Olmstead makes no factual allegations of fraud, nor does Olmstead allege a cause of action for fraud.

Moreover, Defendants argue that Olmstead worked for Cottonwood Creek, and Lanny Derby was not Olmstead's employer. But Olmstead argues that Derby is considered an employer under the UPWA definition of "employer." The UPWA defines employer as "any person acting directly or indirectly in the interest of an employer in relation to an employee." Utah Code Ann. § 34-28-2(1)(c) (citing 29 U.S.C. § 203). Olmstead argues that Derby is a person acting directly or indirectly in the interest of Cottonwood Creek and meets the definition of employer under the UPWA. The Utah Supreme Court, however, has held otherwise in *Heaps v. Nuriche, LLC*, 345

P.3d 655, 658-59 (Utah 2015): "Had the Legislature intended to impose personal liability in contravention of long-standing principles of corporate law, it would have done so expressly as it has in other sections of the code." *Id.*

Olmstead further argues that under the FLSA, Derby can be deemed an "employer," but Olmstead has the burden to allege facts to establish a separate employer-employee relationship, which Olmstead fails to do. Olmstead's Complaint does not allege the requisite facts. In *Lopez v. Next Generation Constr. & Envtl., LLC*, 2016 U.S. Dist. LEXIS 154769, at *9-10 (D. Colo. Nov. 8, 2016), the court found the allegation that defendant was a founder, owner, and operator of the business insufficient to be deemed an employer under the FLSA, especially since the plaintiff failed to allege facts to explain defendant's operational control over the business. *Id.* at 10-11.

Therefore, the court concludes that Olmstead's claims are only against his employer Cottonwood Creek, and Derby is not a proper party to this suit. Accordingly, the court grants Defendants' motion to dismiss Derby as a defendant in this action.

### Defendants' Motion to Compel Arbitration

Defendants move to compel arbitration based on an alleged mutual agreement to arbitrate all claims. Olmstead signed an employee handbook, which includes an agreement to arbitrate all claims. Olmstead disputes whether the signed employee handbook constitutes an enforceable arbitration agreement and asserts, in any event, Defendants have waived the right to arbitrate in this case.

"[T]he right to arbitrate, like any other contract right, can be waived." *Reid Burton Constr., Inc. v. Carpenters Dist. Council*, 535 F.2d 598, 602 (10th Cir. 1976). Even assuming that the employee handbook was an enforceable agreement, Defendants can waive their right to pursue arbitration by pursuing remedies in this court. In analyzing whether a party has waived the right to

arbitrate, the Tenth Circuit looks at the following factors:

> (1) whether the party's actions are inconsistent with the right to arbitrate; (2) whether "the litigation machinery has been substantially invoked" and the parties "were well into preparation of a lawsuit" before the party notified the opposing party of an intent to arbitrate; (3) whether a party either requested arbitration enforcement close to the trial date or delayed for a long period before seeking a stay; (4) whether a defendant seeking arbitration filed a counterclaim without asking for a stay of the proceedings; (5) "whether important intervening steps [e.g. taking advantage of judicial discovery procedures not available in arbitration] had taken place"; and (6) whether the delay "affected, misled, or prejudiced" the opposing party.

*Hill v. Ricoh Americas Corp.*, 603 F.3d 766, 772-73 (19th Cir. 2010) (quoting *Reid Burton*, 614 F.2d at 702).

Defendant's actions in this case are inconsistent with the right to arbitrate because the motion to compel arbitration was filed well after Defendant's motion to dismiss. Defendants claim that they have not received a decision on the motion to dismiss or filed a counterclaim. But Defendants' motion to dismiss substantially invoked the litigation machinery. The court has now ruled and dismissed all claims against Derby and Olmstead's Fourth Cause of Action. These decisions go to the merits of Olmstead's claims. Defendants made a conscious decision to pursue the action in this court, receive rulings from this court, and obtain discovery documents in this court. Although the case is still in its early stages, the court finds that having obtained rulings from this court on several issues, Defendants have waived their right to arbitration. Accordingly, Defendants' Motion to Compel Arbitration is denied.

## CONCLUSION

Based on the above reasoning, Defendants' Motion to Dismiss [ECF No. 12] is GRANTED IN PART AND DENIED IN PART, and Defendants' Motion to Compel Arbitration and to Stay [ECF No. 17] is DENIED. The court dismisses Olmstead's Fourth Cause of Action for

retaliation and wrongful termination and dismisses Lanny Derby as a defendant.

DATED this 20th day of February 2025.

BY THE COURT:

_____
DALE A. KIMBALL
UNITED STATES DISTRICT JUDGE